# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Honorable Marianne O. Battani |

| | | |
|---|---|---|
| In re:  ANTI-VIBRATIONAL RUBBER PARTS | ) | 2:13-cv-00803-MOB-MKM |
| | ) | |
| THIS RELATES TO: | ) | CONSOLIDATED AMENDED<br>CLASS ACTION COMPLAINT |
| | ) | |
| ALL END-PAYOR ACTIONS | ) | |
| | ) | <u>JURY TRIAL DEMANDED</u> |
| | ) | |

Plaintiffs Ifeoma Adams, Halley Ascher, Gregory Asken, Melissa Barron, Kimberly Bennett, David Bernstein, Ron Blau, Tenisha Burgos, Kent Busek, Jennifer Chase, Rita Cornish, Nathan Croom, Lori Curtis, Jessica Decastro, Alena Farrell, Jane Fitzgerald, Carroll Gibbs, Dori Gilels, Jason Grala, Ian Groves, Curtis Gunnerson, Paul Gustafson, Tom Halverson, Curtis Harr, Andrew Hedlund, Gary Arthur Herr, John Hollingsworth, Leonard Julian, Carol Ann Kashishian, Elizabeth Kaufman, Robert Klingler, Kelly Klosterman, James Marean, Michelle McGinn, Nilsa Mercado, Rebecca Lynn Morrow, Edward Muscara, Stacey Nickell, Sophie O'Keefe-Zelman, Roger Olson, Susan Olson, William Picotte, Whitney Porter, Cindy Prince, Janne Rice, Robert Rice, Jr., Frances Gammell-Roach, Darrel Senior, Meetesh Shah, Darcy Sherman, Erica Shoaf, Arthur Stukey, Kathleen Tawney, Jane Taylor, Keith Uehara, Michael Wick, Thomas Wilson and Phillip Young ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, allege as follows:

## NATURE OF ACTION

1.      This lawsuit is brought as a proposed class action against Defendants Yamashita Rubber Co., Ltd., YUSA Corporation, Tokai Rubber Industries, Ltd., DTR Industries, Inc., Bridgestone Corporation, Bridgestone APM Company, Toyo Tire & Rubber Co., Ltd., Toyo Tire North America OE Sales LLC, and Toyo Automotive Parts (USA), Inc. (all as defined below, and collectively "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of Anti-Vibration Rubber Parts (defined below) for engaging in a long-running

conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Anti-Vibration Rubber Parts.

2.     Plaintiffs seek to represent all persons and entities who, during the period from and including March 1, 1996 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period"), purchased or leased a new vehicle in the United States  not for resale which included one or more Anti-Vibration Rubber Part(s) as a component part, or indirectly purchased one or more Anti-Vibration Rubber Part(s) as a replacement part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants or any co-conspirator of the Defendants.

3.     "Anti-Vibration Rubber Parts" are comprised primarily of rubber and metal, and are installed in suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

4.     The Defendants manufacture, market, and sell Anti-Vibration Rubber Parts throughout and into the United States.  The Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, and allocate market shares for Anti-Vibration Ruber Parts.

5.     The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal

investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price fixing and bid-rigging in the automotive parts industry has yielded approximately $2.3 billion in criminal fines. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

6.      On September 26, 2013, the DOJ announced that Yamashita Rubber Co. Ltd. had agreed to plead guilty and to pay a $11 million criminal fine for its role in a conspiracy to fix the prices of Anti-Vibration Rubber Parts installed in automobiles sold in the United States and elsewhere.

7.      On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components including Anti-Vibration Rubber Parts installed in automobiles sold in the United States and elsewhere.

8.      On February 13, 2014, the DOJ announced that Bridgestone Corporation had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of Anti-Vibration Rubber Parts installed in automobiles sold in the United States and elsewhere.

9.      The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Anti-Vibration Rubber Parts sold to automobile manufacturers and others in the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate

and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 and

state antitrust, unfair competition, and consumer protection laws.

10. As a direct result of the anti-competitive and unlawful conduct alleged herein,

Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Anti-Vibration

Rubber Parts during the Class Period and have thereby suffered antitrust injury to their business

or property.

## JURISDICTION AND VENUE

11. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. §

26) to secure equitable and injunctive relief against the Defendants for violating Section 1 of the

Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages

pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain

restitution, recover damages and secure other relief against the Defendants for violations of those

state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under

federal and state law.

12. This Court has jurisdiction over the subject matter of this action pursuant to

Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),

and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter

jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that (i) this is a

class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of

interests and costs, and in which some members of the proposed Classes are citizens of a state

different from the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or

controversy as their federal claims under Article III of the United States Constitution.

4

13.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

14.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Anti-Vibration Rubber Parts throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

15.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

16.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  The Defendants' products are sold in the flow of interstate commerce.

17.     Anti-Vibration Rubber Parts manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Anti-Vibration Rubber Parts are purchased in the United States, and such Anti-Vibration Rubber Parts do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

18.     By reason of the unlawful activities hereinafter alleged, the Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Anti-Vibration Rubber Parts, which conspiracy unreasonably restrained trade and adversely affected the market for Anti-Vibration Rubber Parts.

19.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Anti-Vibration Rubber Parts not for resale, including Plaintiffs and members of the Classes.

## PARTIES

### Plaintiffs

20.     Plaintiff Ifeoma Adams is a California resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

6

21.     Plaintiff Halley Ascher is a District of Columbia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

22.     Plaintiff Gregory Asken is a Nevada resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

23.     Plaintiff Melissa Barron is a California resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

24.     Plaintiff Kimberly Bennett is an Arkansas resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

25.     Plaintiff David Bernstein is a Minnesota resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

26.     Plaintiff Ron Blau is a Massachusetts resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

27.     Plaintiff Tenisha Burgos is a New York resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

28.     Plaintiff Kent Busek is a North Dakota resident who purchased at least one Anti-vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

29.     Plaintiff Jennifer Chase is an Iowa resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

30.     Plaintiff Rita Cornish is a Utah resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

31.     Plaintiff Nathan Croom is a Nebraska resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

32.     Plaintiff Lori Curtis is a Missouri resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

33.     Plaintiff Jessica DeCastro is a Missouri resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

34.     Plaintiff Alena Farrell is a Vermont resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

35.     Plaintiff Jane Fitzgerald is a Vermont resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

36.     Plaintiff Carroll Gibbs is a District of Columbia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

37.     Plaintiff Dori Gilels is a Montana resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

38.     Plaintiff Jason Grala is a New York resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s)..

39.     Plaintiff Ian Groves is a New Mexico resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

40.     Plaintiff Curtis Gunnerson is a Minnesota resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

41.     Plaintiff Paul Gustafson is an Oregon resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

42.     Plaintiff Tom Halverson is an Arizona resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

43.     Plaintiff Curtis Harr is a North Dakota resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

44.     Plaintiff Andrew Hedlund is a South Carolina resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

45.     Plaintiff Gary Arthur Herr is a Florida resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

46.     Plaintiff John Hollingsworth is a California resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

47.     Plaintiff Leonard Julian is a Nevada resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

48.     Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

49.     Plaintiff Elizabeth Kaufman is a Florida resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

50.     Plaintiff Robert Klingler is a Missouri resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

51.     Plaintiff Kelly Klosterman is a North Dakota resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

52.     Plaintiff James Marean is a Maine resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

53.     Plaintiff Michelle McGinn is a Nevada resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

54.     Plaintiff Nilsa Mercado is a Michigan resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

55.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

56.     Plaintiff Edward Muscara is a New Hampshire resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

57.     Plaintiff Stacey Nickell is a West Virginia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

58.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

59.     Plaintiff Roger Olson is a Michigan resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

60.     Plaintiff Susan Olsen is a Michigan resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

61.     Plaintiff William Picotte is a Washington resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s) while a resident of South Dakota.

62.     Plaintiff Whitney Porter is a District of Columbia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

63.     Plaintiff Cindy Prince is a Hawaii resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s) while a resident of Oregon.

10

64.     Plaintiff Janne Rice is a West Virginia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

65.     Plaintiff Robert Rice, Jr. is a West Virginia resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

66.     Plaintiff Frances Gammell-Roach is a Rhode Island resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

67.     Plaintiff Darrel Senior is a Kansas resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

68.     Plaintiff Meetesh Shah is a California resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

69.     Plaintiff Darcy Sherman is a Minnesota resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

70.     Plaintiff Erica Shoaf is an Arizona resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

71.     Plaintiff Arthur Stukey is a Vermont resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

72.     Plaintiff Kathleen Tawney is a North Carolina resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

73.     Plaintiff Jane Taylor is a Hawaii resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

74.     Plaintiff Keith Uehara is a Hawaii resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

75.     Plaintiff Michael Wick is a New Mexico resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

76.     Plaintiff Thomas Wilson is a Mississippi resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

77.     Plaintiff Phillip Young is a Tennessee resident who purchased at least one Anti-Vibration Rubber Part indirectly from at least one Defendant or its co-conspirator(s).

### Defendants

78.     Defendant Yamashita Rubber Co., Ltd. ("Yamashita") is a Japanese corporation with its principal place of business in Saitama, Japan.  Yamashita – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

79.     Defendant YUSA Corporation ("YUSA") is an Ohio corporation with its principal place of business in Washington Court House, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Yamashita.  YUSA manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

80.     Yamashita Rubber Co., Ltd and YUSA Corporation shall be referred to together herein as the "Yamashita Defendants" or "Yamashita."

81.     Defendant Tokai Rubber Industries, Ltd. ("Tokai Industries") is a Japanese corporation with its principal place of business in Aichi, Japan.  Tokai Industries – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

82.     Defendant DTR Industries, Inc. ("DTR") is an Ohio corporation with its principal place of business in Bluffton, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Tokai.  DTR manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

83.     Tokai Rubber Industries, Ltd. and DTR Industries, Inc. shall be referred to together herein as the "Tokai Defendants" or "Tokai."

84.     Defendant Bridgestone Corporation is a Japanese corporation with its principal place of business in Kyobashi, Tokyo, Japan.  Bridgestone Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

85.     Defendant Bridgestone APM Company is a Delaware company with its principal place of business in Findlay, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Bridgestone Corporation.  Bridgestone APM Company manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

86.     Bridgestone Corporation and Bridgestone APM Company shall be referred to together herein as the "Bridgestone Defendants" or "Bridgestone."

87.     Defendant Toyo Tire & Rubber Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan.  Defendant Toyo Tire & Rubber Co., Ltd.– directly

and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

88.    purchased throughout the United States, including in this District, during the Class Period.

89.    Defendant Toyo Tire North America OE Sales LLC is a California company with its principal place of business in White, Georgia.  It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd.  Toyo Tire North America OE Sales LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

90.    Defendant Toyo Automotive Parts (USA), Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd.  Toyo Automotive Parts (USA), Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

91.    Toyo Tire & Rubber Co., Ltd., Toyo Tire North America OE Sales LLC, and Toyo Automotive Parts (USA), Inc. shall be referred to collectively herein as the "Toyo Defendants" or "Toyo."

## AGENTS AND CO-CONSPIRATORS

92.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged.

14

93.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

94.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The Anti-Vibration Rubber Parts Industry

95.     "Anti-Vibration Rubber Parts" are comprised primarily of rubber and metal, and are installed in automobiles to reduce engine and road vibration.  Anti-Vibration Rubber Parts are installed in suspension systems and engine mounts, as well as other parts of automobiles.  *See* Figure 1.

15



Figure 1.

96.     Anti-Vibration Rubber Parts are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Anti-Vibration Rubber Parts.

97.     For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Anti-Vibration Rubber Parts directly from the Defendants.  Anti-Vibration Rubber Parts may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Anti-Vibration Rubber Parts directly to an OEM.

98.     Anti-Vibration Rubber Parts are developed over a year in advance of an automobile model entering the market.  Before ordering Anti-Vibration Rubber Parts for a new model, OEMs – mostly large automotive manufacturers such as Honda, Toyota, Volvo and

General Motors – typically request pricing from suppliers, such as the Defendants, through Requests for Quotation ("RFQ").  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and in the United States.

99.     Defendants and their co-conspirators supplied Anti-Vibration Rubber Parts to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Anti-Vibration Rubber Parts (a) in the United States and elsewhere for installation in vehicles manufactured and sold in the United States, (b) in the United States and elsewhere for installation in vehicles manufactured in Canada and elsewhere for export to and sale in the United States; and (b) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

100.    Plaintiffs and members of the proposed Classes purchased Anti-Vibration Rubber Parts indirectly from one or more of the Defendants.  By way of example, an owner of a vehicle may indirectly purchase one or more Anti-Vibration Rubber Part(s) from the Defendants as part of purchasing or leasing a new vehicle.  An owner of a vehicle may also indirectly purchase for replacement one or more Anti-Vibration Rubber Part(s) from the Defendants when repairing a damaged vehicle or where one or more of the vehicle's Anti-Vibration Rubber Part(s) are defective.

**B.     The Structure and Characteristics of the Anti-Vibration Rubber Parts Market Render the Conspiracy More Plausible**

101.    The structure and other characteristics of the Anti-Vibration Rubber Parts market in the United States are conducive to a price fixing agreement, and have made collusion

particularly attractive in this market.  Specifically, the Anti-Vibration Rubber Parts market: (1) has high barriers to entry; and (2) has inelasticity of demand.

### 1.    The Anti-Vibration Rubber Parts Market Has High Barriers to Entry

102.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

103.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Anti-Vibration Rubber Parts market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

104.    The Defendants own patents related to the manufacture of Anti-Vibration Rubber Parts.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

### 2.    There is Inelasticity of Demand for Anti-Vibration Rubber Parts

105.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

106.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in

declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

107.    Demand for Anti-Vibration Rubber Parts is highly inelastic because there are no close substitutes for these products.  In addition, customers must purchase Anti-Vibration Rubber Parts as an essential part of a vehicle, even if the prices are kept at a supracompetitive level.

### C.    <u>Government Investigations</u>

108.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ and EC would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigations being conducted by the U.S., European and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

109.    The DOJ Antitrust Division's broad criminal investigation into illegal price fixing and bid rigging in the auto parts industry is the largest criminal investigation the Antitrust Division has ever pursued.  The ongoing cartel investigation of price fixing and bid-rigging in the automobile parts industry has yielded approximately $2.3 billion in criminal fines.

110.    On November 16, 2012, the DOJ announced that Hiroshi Yoshida pleaded guilty and agreed to pay a $20,000 criminal fine and serve 12 months and one day in a United States prison for his role in a conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Mr. Yoshida and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by rigging bids

and fixing prices for Anti-Vibration Rubber Parts sold in the United States and elsewhere from at least as early as October 2005 and continuing until as late as June 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  Mr. Yoshida is an employee of Defendant Yamashita Rubber Co., Ltd.[1]

111.    According to the Information filed, Mr. Yoshida and his co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)    attending meetings and engaging in discussions in Japan concerning RFQs and prices for automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere;

(b)    agreeing during those meetings and discussions to allocate between the companies the supply of certain automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere;

(c)    agreeing to exchange prices for certain automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere in accordance with the agreements reached;

(d)    exchanging prices for certain automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere in accordance with the agreements reached;

(e)    agreeing to submit higher bids for the supply of certain automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere;

(f)    submitting higher bids so as not to undercut the other company's bids for the supply of certain automobile Anti-Vibration Rubber Parts sold in the United states and elsewhere in accordance with the agreements reached;

---

[1] *See* Memorandum of Law in Support of Unopposed Motion of the United States to Seal Attachment A to the Plea Agreement at 2, *United States v. Yamashita Rubber Co., Ltd.*, Case No. 3:13-cr-00439 (N.D. Ohio Nov. 9, 2013), ECF No. 9.

(g)      selling automobile Anti-Vibration Rubber Parts in the United States and elsewhere at collusive and noncompetitive prices; and

(h)      accepting payment for automobile Anti-Vibration Rubber Parts sold in the United States and elsewhere at collusive and noncompetitive prices.

112.     The affidavit submitted in support of the criminal complaint filed against Mr. Yoshida (the "Affidavit") states that he conspired with employees of a company that "self-reported its anti-competitive activities to the DOJ and is cooperating with the investigation" and that "has applied for and has received conditional admission to the DOJ's leniency program, as well as a similar leniency program in Japan."  Affidavit at ¶ 9, *United States v. Yoshida*, No. 12-cr-00515 (N.D. Ohio June 15, 2012), ECF No. 1-2.  At a motion hearing in *Yoshida*, it was suggested that the company in question is Tokai Rubber Industries, Ltd.  *See* Transcript of Motion Hearing at 15:11-16:13, *United States v. Yoshida*, No. 12-cr-00515 (N.D. Ohio Aug. 16, 2012), ECF No. 19.

113.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

114.   The Affidavit contains a summary of information provided by a Tokai employee[2] that is illustrative of the unlawful conduct engaged in by Mr. Yoshida and his co-conspirators:

> In late 2003 or early 2004 [this Tokai employee] discussed over the telephone with Yoshida their companies' price quotes to Honda for anti-vibration rubber parts for the 2006 model Honda Civic.  They agreed not to lower their prices in response to requests from Honda, and not to lower their prices to obtain greater market share, unless they were able to provide to each other an engineering reason for the lower price.  This market allocation and pricing agreement reduced price competition for 2006 Honda Civic parts sold in the United States to Honda by [Yamashita] and by [Tokai].
>
> In 2008, [this Tokai employee] met with Yoshida in Japan regarding their companies' planned responses to Honda's RFQ for anti-vibration rubber parts for the 2011 model Honda Civic.  (The 2007 through 2010 models used the same parts as the 2006 model.)  They again agreed not to lower their prices without an engineering reason, and agreed that they would try to maintain their existing market shares for the Civic.  Several months later, [this Tokai employee] and Yoshida exchanged their companies' approximate bid prices for each component over the telephone, and committed to submitting these prices to Honda.  This market allocation and pricing agreement reduced price competition for 2011 Honda Civic parts sold in the United States to Honda by [Yamashita] and by [Tokai].
>
> In 2009, [this Tokai Employee] had a discussion with Yoshida over the telephone regarding their companies' price quotes to Honda for anti-vibration rubber parts for the 2012 model Honda CR-V.  [This Tokai employee] and Yoshida again agreed to try to maintain their existing market shares.  To effectuate their agreement, they again shared their approximate bid prices with each other and committed to submitting those prices to Honda.  This market-allocation and pricing agreement reduced price competition for 2012 Honda CR-V parts sold in the United States to Honda by [Yamashita] and [Tokai].

Affidavit at ¶ 10, *United States v. Yoshida*, No. 12-cr-00515 (N.D. Ohio June 15, 2012) ECF No. 1-2.

---

[2] In the Affidavit, this Tokai employee is referred to as "CW-1," Yamashita is redacted, and Tokai is referred to as "Company A."

115.    Further illustrative of the Defendants' unlawful conduct are e-mails reviewed by the affiant, Special Agent Kevin Brown of the Federal Bureau of Investigation's Cleveland Unit.  Special Agent Brown:

> reviewed a translation of an-email sent by Hiroshi Yoshida to [this Tokai employee] on April 24, 2009.  In the body of the e-mail, Yoshida states that he is informing [this Tokai employee] of [Yamashita's] response, and expresses his willingness to resubmit prices for two parts for which instructions had been received from [this Tokai employee], but where lower prices were submitted due to poor communications. . . .

> reviewed a translation of the e-mail sent by [this Tokai employee] in response to Yoshida's e-mail of April 24, 2009.  In the body of the e-mail, which is also dated April 24, 2009, [this Tokai employee] asks Yoshida if the price could be raised for one of the parts. . . .

> reviewed a translation of an e-mail by [this Tokai employee] forwarding his/her e-mail in response to Yoshida to, among others, an employee of [Yamashita] who at the time worked at its office in the Northern District of Ohio.  Attached to the e-mail, also dated April 24, 2009, is a chart containing prices identified as [Yamashita's] for various anti-vibration rubber parts for the 2011 Honda Civic, including the price of the part [this Tokai employee] asked Yoshida to raise.  In the body of the e-mail, [this Tokai employee] informs the recipients of the pricing request made to Yoshida with respect to that part, and asks that [Tokai] submit a slightly lower price for another part that is included in the chart.

*Id.* at ¶ 12.

116.    The Affidavit also states that Yoshida, in a telephone call with a separate Tokai employee,[3] "described the agreement for the Honda Civic as 'Let's not stick out our hands to take each other's business'" and "further described the implementation of this agreement as representatives of the companies telling each other at what price they would submit bids, and then requesting that the other submit a higher price, so that the higher bidder would not win the business."  *Id.* at ¶ 11.

───────────────

[3] In the Affidavit, the second Tokai employee is referred to as "CW-2."

117.    Furthermore, at a May 31, 2012 interview, Yoshida admitted that "regarding the 2011 Honda Civic, there were discussions and an agreement between the companies not to reduce price quotes for anti-vibration rubber parts in the absence of a valid design change or engineering change" and "they agreed not to submit prices for the 2011 Honda Civic that would be strange, drastic, or unexplainable." *Id.* at ¶ 13.

118.    On September 26, 2013, the DOJ announced that Yamashita Rubber Co., Ltd. had agreed to plead guilty and to pay an $11 million criminal fine for its role in a conspiracy to rig bids for, and to fix, raise and maintain the prices of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Yamashita and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices for Anti-Vibration Rubber Parts sold in the United States and elsewhere from at least as early as April 2003 and continuing until as late as May 2012 in violation of the Sherman Act, 15 U.S.C. § 1.

119.    According to the Information filed, Yamashita and its co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)    participating in meetings and engaging in discussions in Japan concerning RFQs and prices for Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere;

(b)    agreeing during those meetings and discussions to allocate among the companies the supply of certain Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere;

(c)    agreeing on bids and price quotations for the supply of certain Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere;

(d)     discussing and exchanging prices for certain Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere;

(e)     submitting bids and price quotations to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling Anti-Vibration Rubber Parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(g)     accepting payment for Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices.

120.    Also on September 26, 2013, the DOJ announced that Tetsuya Kunida had pleaded guilty and agreed to pay a $20,000 criminal fine and serve 12 months and one day in a United States prison for his role in a conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Mr. Kunida and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, raise, and maintain the prices of, Anti-Vibration Rubber Parts sold to automobile and component manufactures in the United States and elsewhere from at least as early as November 2001 and continuing until as late as May 2012 in violation of the Sherman Act, 15 U.S.C. § 1.  Upon information and  belief, Mr. Kunida is an employee of Defendant Toyo Tire & Rubber Co. Ltd.[4]

---

[4] In its Motion to Seal Attachments A and B to Toyo Tire & Rubber Co. Ltd's Plea Agreement, the DOJ states "not all employees [of Toyo] are subject to the non-prosecution and cooperation provisions in the Plea Agreement.  In this case, four (4) employees were excluded, or carved out . . . . The first carved-out employee, Tetsuya Kunida . . . . has been charged and has entered a separate plea agreement with the United States.  *See* Unopposed Motion to Seal Attachments A and B to the Plea Agreement at 3, *United States v. Toyo Tire & Rubber Co., Ltd.*,

*(continued)*

121.    According to the Information filed, Mr. Kunida and his co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)    participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to automobile and component manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, to allocate among the companies the supply of certain Anti-Vibration Rubber Parts sold in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to automobile and component manufacturers in the United States and elsewhere;

(d)    submitting bids, price quotations, and price adjustments to automobile and component manufacturers in the United States and elsewhere in accordance with the agreements reached;

(e)    selling Anti-Vibration Rubber Parts to automobile and component manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(f)    accepting payment for Ant-Vibration Rubber Parts sold to automobile and component manufacturers in the United States and else where at collusive and noncompetitive prices.

---

*(continued)*

Case No. 3:13-cv-00529 (S.D. Ohio Dec. 4, 2013), ECF No. 3.  However, in the Transcript of his guilty plea, Mr. Kunida states that Yamashita Rubber is his current employer, and he has worked there since April of 1990.  *See* Transcript of Guilty Plea at 7:14-20, United States v. Kunida, Case No. 3:13-cr-00438 (N.D. Ohio Oct. 18, 2013), ECF No. 10.

122.     In the transcript of his guilty plea, Mr. Kunida further explained the nature of the illegal conduct engaged in by Yamashita and its co-conspirators, "From 2002 until the end of June of 2006 while I was in Japan and I was responsible for the Toyota sales activity, I was involved in price fixing and then also allocating the share regarding the vehicles, certain vehicles RFQs and had contact with the company leaders . . . ."[5]

123.     On November 21, 2013, the DOJ announced that a Cleveland federal grand jury returned an indictment against Masao Hayashi and Kenya Nonoyama, two executives of Defendant Toyo Tire & Rubber Co. Ltd.,[6] for their roles in a conspiracy to fix prices of Anti-Vibration Rubber Parts installed in United States automobiles.  Mr. Hayashi, Mr. Nonoyama and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, to rig bids for, and to fix, raise, and maintain the prices of Anti-Vibration Rubber Parts sold in the United States and elsewhere from at least as early as March 1996 and continuing until at least December 2008 in violation of Section 1 of the Sherman Act, 15. U.S.C. § 1.

124.     According to the Indictment filed, Mr. Hayashi, Mr. Nonoyama and their co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)     participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Toyota Motor Corporation, Toyota Motor Engineering & Manufacturing North America, Inc. and affiliated companies (collectively, "Toyota") in the United States and elsewhere;

---

[5] *Id.* at 10:12-17.

[6] *See* Unopposed Motion to Seal Attachments A and B to the Plea Agreement at 3-4, *United States v. Toyo Tire & Rubber Co., Ltd.*, Case No. 3:13-cr-00529 (N.D. Ohio Dec. 4, 2013), ECF No. 3.

(b)     agreeing, during those meetings, conversations, and communications, to allocate among the companies the supply of certain Anti-Vibration Rubber Parts sold in the United States and elsewhere for Toyota vehicles including the Corolla, the Avalon, the Tacoma, the Camry, the Tundra, the Sequoia, the RAV4, the Sienna, the Venza and the Highlander;

(c)     agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Toyota in the United States and elsewhere;

(d)     exchanging information on bids, price quotations, and price adjustments to be submitted to Toyota in the United States and elsewhere, in order to effectuate the agreements; submitting bids, price quotations, and price adjustments to Toyota in the United States and elsewhere in accordance with the agreements;

(e)     submitting bids, price quotations, and price adjustments to Toyota in the United States and elsewhere in accordance with the agreements'

(f)     selling Anti-Vibration Rubber Parts to Toyota in the United States and elsewhere at collusive and noncompetitive prices; and

(g)     accepting payment for Anti-Vibration Rubber Parts sold to Toyota in the United States and elsewhere at collusive and noncompetitive prices.

125.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components, including a conspiracy to fix the prices of Anti-Vibration Rubber Parts.  Toyo and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of, Anti-Vibration Rubber Parts sold

to automobile and component manufactures in the United States and elsewhere from at least as early as March 1996 and continuing until as late as May 2012 in violation of the Sherman Act, 15 U.S.C. § 1.

126.     According to the Information filed, Toyo and its co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)     participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to automobile and component manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, to allocate among the companies certain sales of Anti-Vibration Rubber Parts sold to automobile and component manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to automobile and component manufacturers in the United States and elsewhere;

(d)     exchanging information on bids, price quotations, and price adjustments to be submitted to automobile and component manufacturers in the United States and elsewhere, in order to effectuate the agreements;

(e)     submitting bids, price quotations, and price adjustments to automobile and component manufacturers in the United States and elsewhere in accordance with the agreements;

(f)     selling Anti-Vibration Rubber Parts to automobile and component manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

29

(g)     accepting payment for Anti-Vibration Rubber Parts sold to automobile and component manufacturers in the United States and elsewhere at collusive and noncompetitive prices.

127.    On February 13, 2014 the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of Anti-Vibration Rubber Parts installed in automobiles sold in the United States and elsewhere. Bridgestone and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of Anti-Vibration Rubber Parts sold to automobile and component manufactures in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

128.    According to the Information filed, Bridgestone and its co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)     participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Toyota Motor Corporation, Nissan Motor Corporation, Fuji Heavy Industries, Ltd., Suzuki Motor Corporation, Isuzu Motors, Ltd., and certain of their subsidiaries, affiliates and suppliers (collectively, for the purposes of this paragraph, "Automobile and Component Manufacturers") in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, to allocate among the companies certain sales of certain Anti-Vibration Rubber Products sold to Automobile and Component Manufacturers in the United States and elsewhere;

(c)      agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

(d)      exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United states and elsewhere, in order to effectuate the agreements;

(e)      submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United States and elsewhere in accordance with the agreements;

(f)      selling Anti-Vibration Rubber Parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(g)      accepting payment for Anti-Vibration Rubber Parts sold to Automobile and Component Manufacturers in the United and States and elsewhere at collusive and noncompetitive prices.

129.     On April 15, 2014, the DOJ announced that a Cleveland federal grand jury returned an indictment against a current executive of Defendant Bridgestone Corp., Yoshiyuki Tanaka, and two former executives of Defendant Bridgestone Corp., Yasuo Ryuto and Isao Yoshida, for their roles in a conspiracy to fix prices of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of Anti-Vibration Rubber Parts sold to automobile manufacturers in the

United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

130.     According to the Indictment filed, Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)     participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, to allocate sales of certain Anti-Vibration Rubber Parts sold in the United States and elsewhere for various automobiles including, but not limited to, the Toyota Tacoma, Camry, Tundra, Sequoia, Corolla, Sienna, Venza, and Highlander;

(c)     agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

(d)     exchanging information on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere, in order to effectuate the agreements;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United states and elsewhere in accordance with the agreements;

(f)     selling Anti-Vibration Rubber Parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for Anti-Vibration Rubber Parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h)     employing measure to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms.

131.    On April 16, 2014, the DOJ announced that a former executive of Defendant Bridgestone Corp., Yusuke Shimasaki, had agreed to plead guilty and to pay a $20,000 criminal fine and serve 18 months in a United States prison for his role in a conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Mr. Shimasaki and his co-conspirators participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of Anti-Vibration Rubber Parts sold to automobile and component manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

132.    According to the Information filed, Mr. Shimasaki and his co-conspirators carried out the Anti-Vibration Rubber Parts conspiracy by:

(a)     participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Toyota Motor Corporation, Nissan Motor Co., Ltd., and Fuji Heavy Industries, Ltd., and certain of their subsidiaries, affiliates, and suppliers (collectively, for the purposes of this paragraph, "Automobile and Component Manufacturers") in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, to allocate among the companies the supply of certain Anti-Vibration Rubber Parts sold in the United States and elsewhere;

33

(c)      agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

(d)      exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere, in order to effectuate the agreements;

(e)      submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United states and elsewhere in accordance with the agreements;

(f)      selling Anti-Vibration Rubber Parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for Anti-Vibration Rubber Parts sold to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

133.     employing measure to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms.

### D.      Guilty Pleas in Related Markets in the Automotive Industry

134.     On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

135.     In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, said that "[a]s a result of this international price fixing and bid-

rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

136. On January 30, 2012, the DOJ announced that Yazaki Corporation and DENSO Corporation had agreed to plead guilty and to pay a total of $548 million in criminal fines for their involvement in multiple price fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States. According to the three-count felony charge against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and fix, stabilize and maintain the prices of automotive wire harnesses and related products; (ii) to rig bids for and fix, stabilize and maintain the prices of instrument panel clusters; and (iii) to fix, stabilize and maintain the prices of fuel senders. According to the two-count felony charge against DENSO Corporation, it engaged in conspiracies to rig bids for and to fix, stabilize and maintain the prices of electronic control units and heater control panels.

137. In the press release announcing the fines against Yazaki Corporation and DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ." In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has

been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

138. Ms. Pozen said there is no doubt **consumers** were hurt financially by the automotive wire harness price fixing conspiracy. She further stated: "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

139. On April 3, 2012, the DOJ announced that G.S. Electech Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to fix the prices of speed sensor wire assemblies used on antilock brake systems installed in United States automobiles.

140. On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $220 million criminal fine for its role in a conspiracy to fix prices of automotive wire harnesses and related products installed in United States automobiles.

141. On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty and to pay a $14.5 criminal fine for its role in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in United States automobiles to automobile manufacturers.

142. On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in automobiles sold in the United States.

143. On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its role in a conspiracy to fix

prices of instrument panel clusters installed in automobiles sold in the United States and elsewhere.

144.   On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to fix prices of heater control panels installed in automobiles sold in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

145.   On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say the biggest with respect to the __impact__ on U.S. businesses and __consumers__, and the number of companies and executives that are subject to the investigation*."  (emphasis added).

146.   On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its role in a conspiracy to fix prices of ignition coils installed in automobiles sold in the United States and elsewhere.

147.   In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

148.   On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal for its role in a conspiracy to fix prices of switches, steering angle sensors

and automotive high intensity discharge (HID) ballasts installed in automobiles sold in the United States and elsewhere.

149.    On September 26, 2013, nine additional Japanese automotive suppliers, including Defendant Yamashita Rubber Co. Ltd., agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products.  The other companies charged and fined include:

(a)    Hitachi Automotive Systems, Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold to automobile manufacturers in the United States and elsewhere;

(b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of windshield washer systems and components, windshield wiper systems and components, starter motors, power window motors and fan motors sold to automobile manufactures in the United States and elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice, because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)    Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and

maintain the prices of automotive parts, including starter motors, alternators and ignition coils, sold to automobile manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers (ATF warmers) sold to automobile manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the pries of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere; and

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere.

150.    On the same day, September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct."  Holder also described how the conspiracies worked:  "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

151.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price fixing.



152.    On October 9, 2013, Takata Corporation announced that it had agreed to pay

$71.3 million to settle antitrust charges brought by the United States federal prosecutors for its

role in a conspiracy to price fix seatbelts.

153.    On November 26, 2013, the DOJ announced that Defendant Toyo Tire &

Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in

two separate conspiracies to fix the prices of automotive components, one of which, the Anti-

Vibration Rubber Parts price fixing conspiracy, is the subject of this complaint.  The other price

fixing conspiracy involved driveshaft parts installed in automobiles sold in the United States and elsewhere.

154.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive high-intensity discharge (HID) lamp ballasts installed in automobiles sold in the United States and elsewhere.

155.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price fixing conspiracies involving automobile lighting fixtures and automotive high-intensity discharge (HID) lamp ballasts installed in cars sold in the United States and elsewhere.

156.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

157.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

158.    To date, twenty-seven companies and thirty-five executives have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the automotive parts industry.  Each of the twenty-seven companies has agreed to plead guilty and altogether, they have agreed to pay approximately $2.3 billion in criminal fines.  Twenty-four of

the thirty-five executives have been sentenced to serve time in U.S. prisons or have entered into

plea agreements.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or
> leased a new vehicle in the United States for not for resale which
> included one or more Anti-Vibration Rubber Part(s) as a
> component part, or indirectly purchased one or more Anti-
> Vibration Rubber Part(s) as a replacement part, which were
> manufactured or sold by a Defendant, any current or former
> subsidiary of a Defendant or any co-conspirator of the Defendants.

160.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state

antitrust, unfair competition, and consumer protection laws on behalf of the following class (the

"Damages Class"):

> All persons and entities who, during the Class Period, purchased or
> leased a new vehicle in the Indirect Purchaser States[7] not for resale
> which included one or more Anti-Vibration Rubber Part(s) as a
> component part, or indirectly purchased one or more Anti-
> Vibration Rubber Part(s) as a replacement part, which were
> manufactured or sold by a Defendant, any current or former
> subsidiary of a Defendant or any co-conspirator of the Defendants.

161.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries

and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the

_____

[7] The Indirect Purchaser States are the states listed in the Second and Third Claims for Relief.

federal government, states and their subdivisions, agencies and instrumentalities, and persons

who purchased Anti-Vibration Rubber Parts directly or for resale.

162.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are (at least) thousands of members in each Class.

163.    Common questions of law and fact exist as to all members of the Classes.  This is

particularly true given the nature of the Defendants' and their co-conspirators' conspiracy, which

was generally applicable to all the members of both Classes, thereby making appropriate relief

with respect to the Classes as a whole.  Such questions of law and fact common to the Classes

include, but are not limited to:

(a)    Whether the Defendants and their co-conspirators engaged in a combination

and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Anti-Vibration

Rubber Parts sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by the

Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the

First Claim for Relief;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition

law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)    Whether the conduct of the Defendants and their co-conspirators, as alleged

in this Complaint, caused injury to the business or property of Plaintiffs and the members of the

Classes;

(g)   The effect of the alleged conspiracy on the prices of Anti-Vibration Rubber Parts sold in the United States during the Class Period;

(h)   Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(i)   Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(j)   The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)   The appropriate class-wide measure of damages for the Damages Class.

164.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Anti-Vibration Rubber Parts purchased indirectly from the Defendants and/or their co-conspirators.

165.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

166.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

167.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

168.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

**PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

169.    The Defendants' price fixing conspiracy had the following effects, among others:

(a)   Price competition has been restrained or eliminated with respect to Anti-Vibration Rubber Parts;

(b)   The prices of Anti-Vibration Rubber Parts have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)   Indirect purchasers of Anti-Vibration Rubber Parts have been deprived of free and open competition; and

(d)   Indirect purchasers of Anti-Vibration Rubber Parts paid artificially inflated prices.

170.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Anti-Vibration Rubber Parts.  These inflated prices have been passed on to them by Tier 1 Manufacturers, OEMs and dealers.

171.    The markets for Anti-Vibration Rubber Parts and vehicles are inextricably linked and intertwined because the market for Anti-Vibration Rubber Parts exists to serve the vehicle

46

market.  Without the vehicles, the Anti-Vibration Rubber Parts have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Anti-Vibration Rubber Parts.  As stated in the 2010 Annual Report of Lear Corporation, an automotive parts supplier:  "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

172.    Anti-Vibration Rubber Parts are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Anti-Vibration Rubber Parts follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Anti-Vibration Rubber Parts can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

173.    Just as Anti-Vibration Rubber Parts can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Anti-Vibration Rubber Parts affect prices paid by indirect purchasers of new motor vehicles containing Anti-Vibration Rubber Parts and Anti-Vibration Rubber Parts purchased for repair purposes.

174.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The OEM and dealer markets for new motor vehicles are subject to vigorous price competition.  The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Anti-Vibration Rubber Parts lead to corresponding increases in prices for new motor vehicles and replacement parts at the OEM and dealer levels.  When downstream distribution markets are

47

highly competitive, as they are in the case of new motor vehicles containing Anti-Vibration Rubber Parts as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and class members.

175.    Hence the inflated prices of Anti-Vibration Rubber Parts both in new motor vehicles and those purchased for repair resulting from the Defendants' and their co-conspirators' bid-rigging and price fixing conspiracy have been passed on to Plaintiffs and other class members by Tier 1 Manufacturers, OEMs and dealers.

176.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[8]

177.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.

---

[8] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge:  A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

> When the distribution markets are highly competitive, as they are
> here, all or nearly the entire overcharge will be passed on through
> to ultimate consumers. . . . Both of Microsoft's experts also agree
> upon the economic phenomenon of cost pass through, and how it
> works in competitive markets.  This general phenomenon of cost
> pass through is well established in antitrust laws and economics as
> well.[9]

178.    The purpose of the conspiratorial conduct of the Defendants and their co-

conspirators was to raise, fix, rig or stabilize the price of Anti-Vibration Rubber Parts and, as a

direct and foreseeable result, the price of new motor vehicles containing Anti-Vibration Rubber

Parts and the price of Anti-Vibration Rubber Parts purchased for repair purposes.  Economists

have developed techniques to isolate and understand the relationship between one "explanatory"

variable and a "dependent" variable in those cases when changes in the dependent variable are

explained by changes in a multitude of variables, even when all such variables may be changing

simultaneously.  That analysis - called regression analysis - is commonly used in the real world

and in litigation to determine the impact of a price increase on one cost in a product (or service)

that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an

increase in the price of Anti-Vibration Rubber Parts on prices for new motor vehicles even

though such products contain a number of other components whose prices may be changing over

time.  A regression model can explain how variation in the price of Anti-Vibration Rubber Parts

affects changes in the price of new motor vehicles.  In such models, the price of Anti-Vibration

Rubber Parts would be treated as an independent or explanatory variable.  The model can isolate

how changes in the price of Anti-Vibration Rubber Parts impact the price of new motor vehicles

---

[9] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule
1550(b)) Microsoft I-V Cases*,No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

containing Anti-Vibration Rubber Parts while controlling for the impact of other price-determining factors.

179.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Anti-Vibration Rubber Parts can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and class members can be quantified.

180.    In addition to the regression analysis discussed above demonstrating impact on consumers, the Department of Justice's Antitrust Division, which has been investigating anticompetitive conduct in the automotive parts industry for some time, **has concluded that there is "no doubt" that consumers were hurt financially**.  Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said there is no doubt **consumers** were hurt financially by the automotive wire harness price fixing conspiracy.  "By rigging bids . . . [automotive parts manufacturers engaged in a price fixing conspiracy] inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars," Ms. Pozen said.  She also explained that "[a]s a result of this international price fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  In a separate press statement, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

181.     On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. ***I say the biggest with respect to the*** ***<u>impact</u> on U.S. businesses and <u>consumers</u>, and the number of companies and executives that are subject to the investigation***."  (emphasis added).

182.     On September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct."  Holder also described how the conspiracies worked:  "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

183.     On May 25, 2014, news sources reported that Brent Snyder, a deputy assistant attorney general in the Antitrust Division, said with respect to the automotive parts conspiracies,

"[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."

184.     By reason of the violations of the antitrust laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Anti-Vibration Rubber Parts than they would have paid in the absence of the Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.     The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

185.     Plaintiffs repeat and reallege the allegations set forth above.

186.     Plaintiffs and the members of the Classes had no knowledge of the Anti-Vibration Rubber Parts combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims arising from the alleged conspiracy to fix prices of Anti-Vibration Rubber Parts set forth herein, until (at the earliest), the public announcements of the government investigations began in June 2011. [10]

---

[10] With respect to Defendant Toyo, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest), November 26, 2013, the date the DOJ announced Defendant Toyo Tire & Rubber Co. Ltd.'s anticipated guilty plea.  No information in the public domain was available to the Plaintiffs and the members of the Classes prior to November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co. Ltd's anticipated guilty plea, that revealed sufficient information to suggest that Toyo was involved in a conspiracy to price fix Anti-Vibration Rubber Parts.  Therefore, with respect to Defendant Toyo, the statute of limitations did not begin to run because Plaintiffs did not and could not discover their claims, or

*(continued)*

187.   Plaintiffs and the members of the Classes are purchasers who purchased or leased automobiles or purchased Anti-Vibration Rubber Parts to replace or repair damaged or defective Anti-Vibration Rubber Parts in their automobiles.  They had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the Anti-Vibration Rubber Parts combination and conspiracy described in this Complaint before the public announcements of the government investigations began in June 2011.

188.   No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in June 2011 that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price fix and rig bids for Anti-Vibration Rubber Parts. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with Tier 1 Manufacturers, OEMs or other

---

*(continued)*

in the alternative, because fraudulent concealment tolled the statute of limitations, until November 26, 2013.

   With respect to Defendant Bridgestone, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest), February 13, 2014, the date the DOJ publicly announced Defendant Bridgestone Corporation's anticipated guilty plea.  No information in the public domain was available to the Plaintiffs and the members of the Classes prior to February 13, 2014, the date the DOJ publicly announced Defendant Bridgestone Corporation's anticipated guilty plea, that revealed sufficient information to suggest that Bridgestone was involved in a conspiracy to price fix Anti-Vibration Rubber Parts.  Therefore, with respect to Defendant Bridgestone, the statute of limitations did not begin to run because Plaintiffs did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until February 13, 2014.

direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

189.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

190.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the Anti-Vibration Rubber Parts conspiracy alleged herein until the public announcements of the government investigations began in June 2011.[11]

191.    Before that time, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for Anti-Vibration Rubber Parts throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

192.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

---

[11] *See supra* Footnote 10.

193.     Specifically, as Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

194.     And, as stated in the Indictment filed against Mr. Tanaka, Mr. Ryuto and Mr. Toshida, former and current employees of Bridgestone, and the Information filed against Mr. Shimasaki, a former Bridgestone employee, the Defendants and their co-conspirators employed "measures to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms."

195.     By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.  Anti-Vibration Rubber Parts are not exempt from antitrust regulation, and thus, before June 2011, Plaintiffs reasonably considered the Anti-Vibration Rubber Parts industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of the Defendants' Anti-Vibration Rubber Parts prices prior to the public announcements of the government investigations beginning in June 2011.

196.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

197.     Because the alleged Anti-Vibration Rubber Parts conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, Plaintiffs

55

and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until June 2011, when reports of the investigations into anticompetitive conduct concerning Anti-Vibration Rubber Parts were first publicly disseminated.

198.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims with respect to the alleged Anti-Vibration Rubber Parts conspiracy was tolled and did not begin to run until June 2011.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

199.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

200.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

201.    The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

202.    At least as early as March 1996, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Anti-Vibration Rubber Parts, thereby creating anticompetitive effects.

203.     The anticompetitive acts were intentionally directed at the United States market for Anti-Vibration Rubber Parts and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Anti-Vibration Rubber Parts throughout the United States.

204.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Anti-Vibration Rubber Parts.

205.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Anti-Vibration Rubber Parts have been harmed by being forced to pay inflated, supracompetitive prices for Anti-Vibration Rubber Parts.

206.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

207.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Anti-Vibration Rubber Parts has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Anti-Vibration Rubber Parts sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased Anti-Vibration Rubber Parts indirectly from the Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

208.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Anti-Vibration Rubber Parts purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

209.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

210.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

211.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

212.     From as early as March 1996 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Anti-Vibration Rubber Parts in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

213.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for Anti-Vibration Rubber Parts and to allocate customers for Anti-Vibration Rubber Parts in the United States.

214.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)      participating in meetings and conversations among themselves in the
United States and elsewhere during which they agreed to price Anti-Vibration Rubber Parts at
certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid
by Plaintiffs and members of the Damages Class with respect to Anti-Vibration Rubber Parts
sold in the United States;

(b)      allocating customers and markets for Anti-Vibration Rubber Parts in the
United States in furtherance of their agreements; and

(c)      participating in meetings and conversations among themselves in the
United States and elsewhere to implement, adhere to, and police the unlawful agreements they
reached.

215.    The Defendants and their co-conspirators engaged in the actions described
above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or
stabilize prices and to allocate customers with respect to Anti-Vibration Rubber Parts.

216.    The Defendants' anticompetitive acts described above were knowing, willful
and constitute violations or flagrant violations of the following state antitrust statutes.

217.    The Defendants have entered into an unlawful agreement in restraint of trade in
violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)      The Defendants' and their co-conspirators' combinations or conspiracies
had the following effects:  (1) Anti-Vibration Rubber Parts price competition was restrained,
suppressed, and eliminated throughout Arizona; (2) Anti-Vibration Rubber Parts prices were
raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3)
Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

218.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  The Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Anti-Vibration Rubber Parts at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Anti-Vibration Rubber Parts.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Anti-Vibration Rubber Parts; and (2) Allocating among themselves the production of Anti-Vibration Rubber Parts.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:  (1) Price competition in the sale of Anti-Vibration Rubber Parts has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Anti-Vibration Rubber Parts sold by the Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Anti-Vibration Rubber Parts directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Anti-Vibration Rubber Parts than they otherwise would have paid in the absence of the Defendants' unlawful conduct.  As a result of the Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

219.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

220.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

221.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

63

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

222.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Maine; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

223.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

224.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

65

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

225.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

66

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

226.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Nebraska commerce.

67

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

227.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

228.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

229.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)      The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)      During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

230.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)      The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout New York; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts when they purchased vehicles containing Anti-Vibration Rubber Parts, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)      During the Class Period, the Defendants' illegal conduct substantially affected New York commerce.

(c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

231.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)      The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

232.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

233.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

73

234.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

235.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Anti-Vibration Rubber Part prices were

raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for Anti-Vibration Rubber Parts.

     (b)     During the Class Period, the Defendants' illegal conduct had a substantial

effect on Tennessee commerce.

     (c)     As a direct and proximate result of the Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

     (d)     By reason of the foregoing, the Defendants have entered into agreements

in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code

Ann. §§ 47-25-101, *et seq.*

     236.    The Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

     (a)     The Defendants' and their co-conspirators' combinations or conspiracies

had the following effects: (1) Anti-Vibration Rubber Part price competition was restrained,

suppressed, and eliminated throughout Utah; (2) Anti-Vibration Rubber Part prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-

Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

237.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

76

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

238.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

239.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq.*

77

(a)      The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)      During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

240.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of the Defendants' and their co-conspirators' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Anti-Vibration Rubber Parts than they otherwise would have paid in the absence of the Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

241.     In addition, the Defendants have profited significantly from the aforesaid conspiracy.   The Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

242.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

243.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

244.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

245.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, §§ 4-88-101, *et seq.*

(a)     Defendants knowingly agreed to, and did in fat, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Parts price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Anti-Vibration Rubber Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

246.    The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, the Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as

alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(d)     The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     The Defendants' acts or practices are unfair to purchasers of Anti-Vibration Rubber Parts (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     The Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Anti-Vibration Rubber Parts (or vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of the Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

247.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed or obtained in the District of Columbia.

82

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

248.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Florida; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

249.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

84

(d)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

250.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts and practices in violation of Mass. G.L. c. 93A, §2.

(a)     The Defendants were engaged in trade or commerce as defined by Mass. G.L. c. 93A.

(b)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects: (1) Anti-Vibration Rubber Parts price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Anti-Vibration Rubber Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class were injured and are threatened with further injury.

(e)     The Defendants have been mailed or delivered a demand letter in accordance with Mass. G.L. c. 93A, §9, or, upon information and belief, such receipt of a demand letter was unnecessary due to the Defendant(s) not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were mailed or delivered, and each Defendant has failed to make a reasonable settlement offer.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of Mass. G.L. c. 93A, §2.  The Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and the members of the Damages Class to multiple damages.

251.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)     Plaintiffs and the Damages Class purchased Anti-Vibration Rubber Parts for personal, family, or household purposes.

(b)     The Defendants engaged in the conduct described herein in connection with the sale of Anti-Vibration Rubber Parts in trade or commerce in a market that includes Missouri.

(c)     The Defendants and their co-conspirators agreed to, and did in fact, affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public

policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)     The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Anti-Vibration Rubber Parts.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Anti-Vibration Rubber Parts they purchased.

(e)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(f)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(g)     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(h)     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

252.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

(a)    The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Montana; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

253.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Anti-Vibration Rubber Parts as set forth in N.M.S.A., § 57-12-2E.

(c)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

254.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout New York; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce and consumers.

(e)     During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Anti-Vibration Rubber Parts in New York.

(f)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

255.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     The Defendants' unlawful conduct had the following effects: (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

91

the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)     During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Anti-Vibration Rubber Parts in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

256.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)     Plaintiffs and members of the Damages Class purchased Anti-Vibration Rubber Parts for personal, family, or household purposes.

(b)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed, or obtained in Rhode Island.

(c)     The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated

92

prices for Anti-Vibration Rubber Parts. The Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, they breached that duty by their silence.  The Defendants misrepresented to all purchasers during the Class Period that their Anti-Vibration Rubber Part prices were competitive and fair.

(d)     The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

(f)     The Defendants' deception, including their omissions concerning the prices of Anti-Vibration Rubber Parts, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Anti-Vibration Rubber Parts at prices born by a free and fair market.  The Defendants' omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Anti-Vibration Rubber Parts they purchased.

(g)      The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Anti-Vibration Rubber Parts price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Anti-Vibration Rubber Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)      As a Direction and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

258.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)      The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Anti-Vibration Rubber Parts were sold, distributed, or obtained in Vermont.

(b)      The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Anti-Vibration Rubber Parts.  The Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, the Defendants breached that duty by their silence.  The Defendants misrepresented to all purchasers during the Class Period that their Anti-Vibration Rubber Part prices were competitive and fair.

(c)      The Defendants' unlawful conduct had the following effects:  (1) Anti-Vibration Rubber Part price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Anti-Vibration Rubber Part prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Anti-Vibration Rubber Parts.

(d)      As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

(e)      The Defendants' deception, including their omissions concerning the prices of Anti-Vibration Rubber Parts, likely misled all purchasers acting reasonably under the

circumstances to believe that they were purchasing Anti-Vibration Rubber Parts at prices born by a free and fair market.  The Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act; and

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein;

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

96

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  June 13, 2014

**THE MILLER LAW FIRM, P.C.**

By  /s/ E. Powell Miller
E. Powell Miller (P39487)
Adam T. Schnatz (P72049)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com
ats@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison
Counsel for the Proposed End-Payor Plaintiffs
Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS, KAPLAN, MILLER & CIRESI
L.L.P**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wvreiss@rkmc.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com


Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for the Proposed End-Payor
Plaintiffs Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED:  June 13, 2014                **THE MILLER LAW FIRM, P.C.**


By  /s/ E. Powell Miller
E. Powell Miller (P39487)
Adam T. Schnatz (P72049)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com
ats@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison
Counsel for the Proposed End-Payor Plaintiffs
Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS, KAPLAN, MILLER & CIRESI
L.L.P**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wvreiss@rkmc.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for the Proposed End-Payor
Plaintiffs Classes*